On petition to review ballot title filed October 18, considered and taken under advisement on December 6; ballot title referred to Attorney General for modification December 30, 2022

Reed SCOTT-SCHWALBACH,
*Petitioner,*

*v.*

Ellen ROSENBLUM,
Attorney General, State of Oregon,
*Respondent.*

(SC S069830)

523 P3d 113

Petitioner challenged all parts of the certified ballot title that the Attorney General prepared for Initiative Petition 5 (2024) (IP 5). If approved, IP 5 would create a constitutional right for parents to select any kindergarten-through-twelfth-grade Oregon public school statewide, including any public charter school, for their children to attend throughout each school year; would require the chosen school district to admit the child for enrollment, with prioritization for admission based on residency only or, if more applicants than remaining spaces, based on an "Equitable Lottery" process; and would require the chosen school district to provide the child with "free and appropriate public education." *Held*: (1) The caption and the "yes" result statement must be modified to describe a major effect of IP 5, if approved, that discretion currently granted to school districts to admit nonresident students would be eliminated; (2) the summary must be modified to inform voters that, upon the exercise of the new constitutional right, home districts would experience a fiscal impact.

The ballot title is referred to the Attorney General for modification.

En Banc

Margaret S. Olney, Bennett Harman, LLP, Portland, filed the petition and reply for petitioner.

Carson L. Whitehead, Assistant Attorney General, Salem, filed the answering memorandum for respondent. Also on the memorandum were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

GARRETT, J.

The ballot title is referred to the Attorney General for modification.

**GARRETT, J.**

Petitioner seeks review of the Attorney General's certified ballot title for Initiative Petition 5 (2024) (IP 5), contending that various aspects do not comply with the requirements for ballot titles set out in ORS 250.035(2). We review the certified ballot title to determine whether it substantially complies with those requirements. *See* ORS 250.085(5) (setting out that standard). For the reasons explained below, we refer the ballot title for IP 5 to the Attorney General for modification.

## I.   BACKGROUND

IP 5, a copy of which is attached as an Appendix, proposes an amendment—entitled "Open Enrollment Amendment"—to be added to Article VIII of the Oregon Constitution. The proposal would create a constitutional right for parents to select any kindergarten-through-twelfth-grade ("K-12") Oregon public school statewide, including any public charter school, for their children to attend throughout each school year, defined in the measure as a parent's "chosen school." IP 5, §§ 2, 4. Unless an exception set out in the measure applies, the chosen school district would be required to admit the child for enrollment in the chosen school. *Id.* § 4.

The first exception to required admission provides that, for any classroom space or program in the chosen school for each school year, admission priorities would be as follows: A child residing in the school's "attendance zone," if any,[1] would be given "first priority"; a child residing in the "chosen school district" would be given "second priority"; and any other child would be given "third priority." *Id.* § 4.a. The second exception provides that the chosen school district may deny permission to enroll a child residing outside the chosen school's attendance zone if no remaining classroom or program capacity exists (with an exception for enrollments required by federal law); but, before denying admission, the chosen school district would be required

---

[1] "Attendance Zone" means "an area within a School District that is designated as the assigned area in which resident parents send a child to a specific Public School." IP 5, § 3.e.

to "make every possible reasonable and good faith effort" to accept the child into the chosen school. *Id.* § 4.b. The third exception provides that, if there were more applicants for a particular chosen school than remaining available spaces, then the chosen school district would be required to select a child for admission to the chosen school through an "Equitable Lottery" process, *id.* § 4.c, which "must give each participating Child an equal chance of selection," *id.* § 3.i. Finally, in selecting a child to accept, the chosen school district would be precluded from either denying consent or giving priority based on a variety of circumstances personal to the child.[2] *Id.* § 4.d.

Upon admission for enrollment by the chosen school, the child would become an "Open Enrollment Student." That, in turn, would require the chosen school district to provide the child with "free and appropriate public education," with no need for the child to reapply in subsequent years for enrollment in the chosen school district. *Id.* § 5.a., b. If adopted, IP 5 would apply to "schooling provided from July 1, 2025, onwards." *Id.* § 7.[3]

The Attorney General prepared a draft ballot title for IP 5, ORS 250.065(3), and the Secretary of State circulated that ballot title for public comment, ORS 250.067(1). After considering substantive comments received, the Attorney General modified her draft ballot title, ORS 250.067(2)(a), and certified the following ballot title to the Secretary of State:

"**Amends Constitution: Parent may select any
K-12 public/charter school; priority for residents,
returning students; admissions lottery**

"**Result of 'Yes' Vote:**  Parent may select any K-12 public/charter school statewide. Admission priority for residents, returning students; no criteria/other preferences allowed. If space limited, lottery used.

---

[2] Those circumstances include "race, religion, creed, sex, gender, ethnicity, political belief, national origin, disability, terms of an individualized education program, income level, proficiency in the English language or athletic ability." IP 5, § 4.d.

[3] IP 5 contains other provisions not summarized here. As noted, it is set out in full in the Appendix.

"**Result of 'No' Vote:**   'No' vote retains current law. No constitutional right to select among public schools. Schools may prioritize admission for sibling preference, academics, at-risk status, other criteria.

"**Summary:**   Amends constitution. Currently, parents may transfer children between K-12 public schools, when permitted by district. Schools may have non-discriminatory criteria for magnet programs/charter schools, including academics, at-risk status, sibling preference. Measure gives parents right to select any public/charter school statewide. Priority given first to resident of attendance zone (assigned area where resident sends child to specific school); second to district resident; third to outside district. No admission criteria/other preference allowed. When space limited, school must use lottery for each priority level, give child equal chance of selection. Returning students do not need to reapply. Admission open throughout school year. District not required to transport child outside assigned attendance zone. State adopts uniform application for enrollment. Applies starting July 2025."

Petitioner is an elector who timely submitted comments about the Attorney General's draft ballot title for IP 5 and who is dissatisfied with all parts of the certified ballot title. *See* ORS 250.085(2) (describing who may challenge certified ballot title). We conclude, as explained below, that the caption, the "yes" result statement, and the summary must be modified.

## II.   ANALYSIS

### A.   *Caption*

We begin with the caption, which must, in 15 or fewer words, "reasonably identif[y] the subject matter" of the proposed measure. ORS 250.035(2)(a). Petitioner argues that the wording in the caption of the certified ballot title for IP 5—"[p]arent may select any K-12 public/charter school"—is problematic because voters will not understand that, under IP 5, schools are required to admit students "on demand," so long as they have capacity to do so. The Attorney General acknowledges that IP 5 would remove discretion currently granted by statute to school districts, effectively transferring that authority to parents. *See* ORS 339.133(5)(a) (if a parent seeks admission to a school in a district where the

parent does not reside, the district has discretion whether to admit the student, which requires written consent from both the sending and receiving districts); ORS 339.127 (setting out factors that a school district may not consider when determining whether to admit nonresident students or establishing any terms of consent, and setting out other processes relating to consent); ORS 339.128 (setting out factors that a school district may not consider when choosing to admit nonresident students, for districts that charge admission to nonresident students). But, she argues, the "core legal effect" of IP 5 is the new right granted to parents, not the removal of discretion from school districts. As explained next, we disagree.

The "subject matter" of a proposed measure is its "actual major effect" or, "if the measure has more than one major effect, all such effects (to the limit of the available words)." *Whitsett v. Kroger*, 348 Or 243, 247, 230 P3d 545 (2010). To determine the subject matter, we first examine the words of the proposed measure, as well as "the changes, if any, that the proposed measure would enact in the context of existing law." *Kain/Waller v. Myers*, 337 Or 36, 41, 93 P3d 62 (2004).

Examining the words of IP 5, it is apparent that its express actual major effect is the creation of a new, unilateral constitutional "right" conferred to parents to select chosen schools for their children. When that new right is considered in light of existing law, however, the measure's subject matter concomitantly encompasses the significant change that petitioner has identified: The elimination of school district discretion to admit nonresident students. Stated another way, the measure, in effect, would transform the discretionary admission authority that the legislature has conferred to school districts into a constitutional, unilateral authority that may be exercised by parents (absent capacity constraints and subject to other narrow exceptions).

That significant change is an actual major effect that the caption must describe within its 15-word limit. *See Unger v. Rosenblum*, 361 Or 814, 818, 401 P3d 789 (2017) (concluding that Attorney General's caption did not adequately describe a second major effect of a measure proposing

acceptance of digital signatures on initiative and referenda petitions); *see also generally Caruthers v. Kroger*, 347 Or 660, 667, 227 P3d 723 (2010) (proposed measure to guarantee a new constitutional "right" to have an initiative or referendum signature "count" would have set aside statutory or rule-based "impediments" to "counting" such signatures—which was an important aspect of the "true subject matter" of the measure that must be included in the caption); *Mabon v. Myers*, 333 Or 252, 257, 39 P3d 171 (2002) (caption of ballot title for measure seeking to replace existing judicial oaths with new oath was insufficient in part because it gave no indication that the measure would replace or subsume existing oaths). The caption therefore must be modified to highlight that paradigm shift to voters.

B.   *"Yes" Result Statement*

We turn to the "yes" result statement, which must be a "simple and understandable" statement not exceeding 25 words that "describes the result" if the proposed measure is approved. ORS 250.035(2)(b). We agree with one of petitioner's challenges to the "yes" result statement that relates to our discussion about the caption—that current law authorizes school districts to exercise discretion in deciding whether to admit or deny nonresident students, but the "yes" result statement does not explain that such discretion would be eliminated if IP 5 is approved. The "yes" result statement, like the caption, therefore must be modified. *See Mabon*, 333 Or at 257-58 (requiring modification to "yes" result statement that, like the caption, did not mention the scope of the change that would result from adoption of the proposed measure—that a new constitutional judicial oath would replace or subsume existing oaths).

C.   *Summary*

The summary of a ballot title must contain "a concise and impartial statement" not exceeding 125 words that "summariz[es] the *** measure and its major effect." ORS 250.035(2)(d); *see also McCann/Harmon v. Rosenblum*, 354 Or 701, 708, 320 P3d 548 (2014) (the purpose of the summary is "to give voters enough information to understand what will happen if the initiative is adopted"); *Witt v. Kulongoski*, 319 Or 7, 10 n 3, 872 P2d 14 (1994) (to the

extent permitted by the statutory word limit, the summary must describe a measure's multiple subjects, purposes, and effects). Petitioner contends that the summary in the certified ballot title for IP 5 should identify the "destabilizing impact on school funding" that would result from the proposed measure's adoption—specifically, the impact that would flow from the requirement (stated here in petitioner's words) that "state school support dollars follow the student[.]" *See* IP 5, § 5.b. (once enrolled in a school within the chosen school district, that district "shall provide the Open Enrollment Student with free and appropriate public education").

The Attorney General responds that the summary appropriately omits any discussion about school funding, reasoning that IP 5 would have no "direct effect" on how the state funds public schools because it would not change certain aspects of current law. For example, she continues, by statute, school funding is provided to school districts based on the number of residents who attend. ORS 327.008-327.113. And, when students transfer between districts pursuant to an interdistrict transfer agreement, the funding already follows the student. *See* OAR 581-021-0019(2)(a) (pursuant to ORS 339.127 (cited earlier), a school district may enroll a nonresident student "and receive State School Fund money for the student" if the affected school districts and the student's parent (or guardian or person in a parental relationship) all have signed an Interdistrict Transfer Agreement).

On the one hand, the Attorney General is correct that IP 5 might not directly affect the current statutory scheme pertaining to school funding.[4] And, of course, the extent of the potential impact of the proposed measure on school district finances cannot be presently known. *See generally Ascher v. Kulongoski*, 322 Or 516, 523, 909 P2d 1216 (1996) (summary did not require modification to describe an anticipated, but not expressly identified or measured, loss of federal funding that would result from adoption of

---

[4] The Attorney General appears to agree with petitioner's assessment that, pursuant to section 5.b., IP 5 would require state school support dollars to follow the student.

proposed measure). But it is not speculative that IP 5, as a *constitutional* matter, would require a chosen school district to provide an open enrollment student "with free and appropriate education," for as long as the student remains enrolled in that district. IP 5, § 5.b. Neither is it speculative that the measure, if adopted, would have *some* fiscal impact on school districts, to the extent that parents exercise their new right: For each parent who selects and sends their child to a school outside their home district, the home district would experience a fiscal impact, because funding must follow the student.

In short, IP 5 would have a nonspeculative fiscal consequence attributable to the rule that funding follows the student—a feature of present law that is not mentioned in the Attorney General's proposed ballot title, and without which voters cannot appreciate that effect of the measure. Although we disagree with petitioner that the summary must describe what he characterizes as the potential "destabilizing" impact on school funding that would flow from adoption of the proposed measure, we conclude that it must contain information sufficient to inform voters that parents' exercise of the new constitutional right would have the nonspeculative fiscal consequences that we have described. *See generally Caruthers v. Myers*, 343 Or 162, 169-70, 166 P3d 514 (2007) (citing *Kain/Waller*, 337 Or at 40-44, in the context of discussing summary requirements, for the proposition that "a particular feature of a proposed measure may, depending on its prominence and centrality, be either the 'subject matter' or an 'effect' of that measure"); *Caruthers*, 343 Or at 169-70 (summary for a proposed statewide law concerning residential tax assessments must mention what the court characterized as an unquestionable and "noticeable loss of revenue that will have a significant impact through the local government system" if the proposed measure were adopted).[5] The summary accordingly must be modified.

---

[5] *Cf. Kane v. Kulongoski*, 319 Or 88, 91, 272 P3d 981 (1994) (explaining that, although the fiscal effect of a measure may qualify as a major effect that must be included in the summary, such effects must be clear, not merely speculative; declining to require summary to include a "prediction" about the potential fiscal impact of a proposed repeal of constitutional property tax limits).

### III.    CONCLUSION

In sum, we conclude that the caption, the "yes" result statement, and the summary of the certified ballot title for IP 5 all require modification. We therefore refer the ballot title to the Attorney General for modification, as described in this opinion.[6]

The ballot title is referred to the Attorney General for modification.

---

[6] We have considered petitioner's other challenges to the certified ballot title for IP 5 and have concluded that none has merit under the "substantial compliance" standard set out in ORS 250.085(5).

## APPENDIX

## OPEN ENROLLMENT AMENDMENT

Whereas, every Oregon child deserves an equal opportunity to receive a quality education;

Whereas, an Oregon family's zip code or income level should not be a barrier to what education their children receive;

Whereas, parents are now aware that education comes in different forms, some of which do not fit the needs of their children;

Whereas, no child should be trapped in a particular school or form of schooling that does not fit the educational needs of the child;

Whereas, parents have the primary right and duty to educate their children;

Whereas, parents are uniquely aware of what is best for their children;

Whereas, parents want to choose the schooling options to ensure that their children receive the best education possible;

Therefore, Be It Enacted by the People of the State of Oregon:

## OPEN ENROLLMENT AMENDMENT

1.  This Section is added to Article VIII of the Oregon Constitution. This Section shall be called the Open Enrollment Amendment.

2.  Each Parent has the right to choose the Public School which the Parent's Child attends as provided in this Section.

3.  For purposes of this Section:

    a.  "Parent" means an Oregon resident who is a parent, guardian, custodian or other person with the authority to act on behalf of the Child.

    b.  "Child" means an Oregon resident of school attendance age for grades Kindergarten through twelfth

grade ("K-12") who is eligible to enroll in an Oregon K-12 public school.

c.   "Public School" means an Oregon public school providing education to any child in K-12, including charter schools.

d.   "School District" means a public school district established by the state.

e.   "Attendance Zone" means an area within a School District that is designated as the assigned area in which resident parents send a child to a specific Public School.

f.   "Resident School District" means the School District in which the Child resides.

g.   "Chosen School" means the Public School chosen by the Parent for the Child to attend under this Section.

h.   "Chosen School District" means the School District that includes the Chosen School.

i.   "Equitable Lottery" means the process to select a Child to attend a Chosen School under this Section in the event that there are more applicants who wish to attend a Chosen School than there is space in the Chosen School. The process must give each participating Child an equal chance of selection.

j.   "School Year" means the time Oregon public school students receive education services during a twelve-month period.

4.   As a method of voluntary school choice for a Child, a Parent whose Child is not then subject to expulsion or suspension in the Child's current school has the right throughout each School Year to choose any Public School within the state for the Parent's Child to attend, for the appropriate grade level. Except as provided below, the Chosen School District shall then admit a Child for enrollment at the Chosen School under this Section.

a.   For any classroom space or program in the Chosen School for each School Year, a Child who is a resident

of the Attendance Zone of the Chosen School shall be given first priority if the Chosen School has an Attendance Zone; any other Child who is a resident of the Chosen School District shall be given second priority; and a Child who is not a resident of the Chosen School District shall be given third priority.

b.  The Chosen School District may deny a Child outside the Attendance Zone of the Chosen School permission to enroll in the Chosen School if there is no remaining classroom space or capacity within a particular program, unless enrollment is required by federal law. Prior to denying the Child, the Chosen School District shall make every possible reasonable and good faith effort to accept the Child under this Section.

c.  If there are more applicants for the Chosen School than there are remaining spaces available for the same priority level, the Chosen School District shall select a Child to attend the Chosen School by an Equitable Lottery process.

d.  In selecting a Child to attend the Chosen School, the Chosen School District may not deny consent nor give priority based on race, religion, creed, sex, gender, ethnicity, political belief, national origin, disability, terms of an individualized education program, income level, proficiency in the English language or athletic ability.

e.  Once a Child is admitted for enrollment by the Chosen School, the Child shall become an Open Enrollment Student.

5.  An Open Enrollment Student shall be considered a resident of the Chosen School District.

a.  The Chosen School District shall accept all credits toward graduation earned by the Child in any previous School District, private school, or homeschool.

b.  Once enrolled in a school within the Chosen School District, and unless expelled, the Chosen School District shall provide the Open Enrollment Student

with free and appropriate public education, and the Open Enrollment Student shall not need to reapply in subsequent years for enrollment in the Chosen School District.

c. Except as required by federal law, the Chosen School District shall not be required to provide transportation outside the Attendance Zone of the Chosen School District to an Open Enrollment Student.

d. The Resident School District shall provide the Chosen School District with a complete copy of the Open Enrollment Student's school records.

6. To enable a Parent to make an informed decision about open enrollment under this Section, each School District shall make readily and easily available to a Parent of the School District detailed information about the statewide, year-round open enrollment application process, including a simple statewide application form, how and where to obtain and submit the application form, whom to contact with questions about open enrollment, and when and how notification of acceptance or denial will be provided to the Parent by the School District.

7. This Section applies to schooling provided from July 1, 2025, onwards.